IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| JOHN CALLAWAY and LISA CALLAWAY,<br><br>        Plaintiffs,<br><br>        v.<br><br>KEVIN O'CONNELL, M.D.,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CIVIL ACTION NO. 5:13-CV-3 (MTT) |

## ORDER

This matter is before the Court on the Defendant's motion for summary judgment

and motions in limine to exclude the expert testimony of Dr. Dozier Russell Hood and

Dr. Matthew E. Spector (Docs. 17-19) and the Plaintiffs' motion in limine to exclude the

expert testimony of Dr. Trad Wadsworth (Doc. 20).  For the reasons discussed below,

the Defendant's motions in limine are **DENIED**, the Defendant's motion for summary

judgment is **GRANTED in part and DENIED in part**, and the Plaintiffs' motion in limine

is **DENIED**.

## I.  FACTUAL BACKGROUND

Plaintiff John Callaway[1] was admitted to the hospital on March 22, 2011 after

being diagnosed with Stage 4 laryngeal cancer.  (Doc. 17-2 at ¶ 1).  On March 28,

2011, Defendant Dr. Kevin O'Connell, an otolaryngologist, discussed Callaway's cancer

treatment options with him, including the option of chemotherapy and radiation

---

[1] John Callaway's wife, Lisa Callaway, is also a Plaintiff in this case.  The Court's use of "Callaway" in this Order refers to John Callaway.

treatment versus surgery.[2]  (Doc. 17-2 at ¶ 3).  Callaway contends O'Connell stated that

surgery was the only treatment option that would cure Callaway's cancer, and O'Connell

failed to inform Callaway of the success rates of preoperative chemoradiation therapy.

(Doc. 24 at ¶ 3).  O'Connell also advised Callaway that he could seek a second opinion.

(Doc. 17-2 at ¶ 5).  Callaway did not get a second opinion because he believed

O'Connell was confident that surgery could cure his cancer.  Callaway also alleges that

O'Connell stated another doctor would propose the same course of treatment.  (Doc. 24

at ¶ 6).  Callaway opted to have surgery, and O'Connell documented the treatment plan

of surgery in the form of a total laryngectomy and bilateral neck dissections.  (Doc. 17-2

at ¶ 3).

O'Connell and Callaway discussed the risks of surgical treatment, including that

Callaway would lose his voice box, would always have a tracheostomy, would always

need a speech apparatus, and might have trouble swallowing.  (Docs. 17-2 at ¶ 13; 24

at ¶ 9).  However, Callaway also contends O'Connell advised him that he would be able

to return to work following surgery, and O'Connell never discussed the possibility that

Callaway could become disabled from the surgery.  (Doc. 24 at ¶ 9).  Callaway signed

an informed consent form, and O'Connell performed the surgery on April 7, 2011.  (Doc.

17-2 at ¶ 10).

Following surgery, Callaway developed a fistula[3] that requires him to use a

feeding tube and prevents him from working.  Although fistulas may sometimes be

---

[2] There are three standard treatment options for Stage 4 laryngeal cancer: (1) "[t]otal laryngectomy with postoperative radiation therapy;" (2) "definitive radiation therapy with surgery for salvage of radiation failures;" and (3) "chemotherapy administered concomitantly with radiation therapy."  (Doc. 24 at ¶ 2).

[3] A fistula is an incomplete closure of connective tissue and a known complication of this procedure even with good surgical technique.  (Doc. 17-2 at ¶ 17).

surgically repaired, Callaway has not attempted to have his fistula repaired because he is not financially able to do so.  (Docs. 17-2 at ¶ 18; 24 at ¶ 18).  Callaway has remained cancer free since surgery.  (Doc. 17-2 at ¶ 12).

## II.  MOTIONS IN LIMINE

### A.  Standard of Review

When evaluating expert testimony in Georgia medical malpractice claims brought in federal court pursuant to diversity jurisdiction, the competency of an expert is determined by Georgia substantive law.  *McDowell v. Brown*, 392 F.3d 1283, 1295 (11th Cir. 2004).  "Once a plaintiff has met the burden of producing a competent expert, a district court must still engage in a Rule 702 analysis [because] the state law 'is directed at establishing a substantive issue in the case,' while the gatekeeping structure of Rule 702 is 'designed to ensure fair administration' of the case."  *Id.* (quoting *Legg v. Chopra*, 286 F.3d 286, 292 (6th Cir. 2002)).

In this case, the competency requirement concerns whether the proffered experts are qualified to render an opinion regarding the applicable standard of care.  In a medical malpractice action, the opinion of an expert who is otherwise qualified will be admissible only if, at the time of the alleged act or omission, the expert:

> (1) Was licensed by an appropriate regulatory agency to practice his or her profession in the state in which such expert was practicing or teaching in the profession at such time; and

> (2) In the case of a medical malpractice action, had actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given as the result of having been regularly engaged in:

>> (A) The active practice of such area of specialty of his or her profession for at least three of the last five years, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in performing the procedure, diagnosing

the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue … .

O.C.G.A. § 24-7-702(c).  "[T]he requirement that the expert have 'actual professional knowledge and experience in the area of practice or specialty *in which the opinion is to be given*' means that the plaintiff's expert does not have to have knowledge and experience in the 'same area of practice/specialty as the defendant doctor.'"  *Nathans v. Diamond*, 282 Ga. 804, 806, 654 S.E.2d 121, 123 (2007) (citation omitted).  Rather, the expert must have "knowledge and experience in the practice or specialty that is relevant to the acts or omissions that the plaintiff alleges constitute malpractice and caused the plaintiff's injuries."  *Id.* (citations omitted).  Once the expert is found competent to testify under the qualifications statute, his testimony should then be screened under Rule 702 to determine if it is otherwise admissible expert testimony.

Pursuant to Rule 702, the opinion of an expert witness who is qualified based on knowledge, skill, experience, training, or education is admissible if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The proponent of the expert testimony has the burden of showing that: (1) the expert is qualified to testify competently regarding the matters the expert will address; (2) the methodology used by the expert is sufficiently reliable; and (3) the

testimony will assist the trier of fact.  *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (citation omitted).

To assess reliability, trial courts must determine "whether the reasoning or methodology underlying the testimony is ... valid and whether that reasoning or methodology properly can be applied to the facts in issue."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993).  This inquiry must focus "solely on the principles and methodology [of the expert], not on the conclusions that they generate." *Id.* at 595.

To assist the trier of fact, expert testimony must "concern[] matters that are beyond the understanding of the average lay person."  *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004) (citation omitted).  "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."  *Id.* at 1262-63 (citation omitted).

That said, judges are only *Daubert*'s gatekeepers, nothing more:

> We have repeatedly stressed *Daubert*'s teaching that the gatekeeping function under Rule 702 "is not intended to supplant the adversary system or the role of the jury: 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking *shaky but admissible evidence.*'"

*Adams v. Lab. Corp. of Am.*, ___ F.3d ___, 2014 WL 3724190, at *8 (11th Cir.) (quoting *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (emphasis added by Eleventh Circuit)).

**B. Dr. Dozier Russell Hood**

Dr. Hood is a community-based otolaryngologist who practices in Fayetteville, Georgia, and he is board certified by the American Board of Otolaryngology Head and Neck Surgery. (Doc. 26-2 at 19). Although Dr. Hood has not performed the surgery at issue within the requisite time period, he has performed laryngectomies in the past and is familiar with the procedure. Dr. Hood has treated and continues to treat patients with Stage 4 laryngeal cancer, and he advises these patients of their treatment options. He is also familiar with proper post-surgical anatomy following a laryngectomy.

O'Connell argues that Callaway's expert, Dr. Hood, should be excluded from testifying because he is not qualified pursuant to O.C.G.A. § 24-7-702(c). Dr. Hood has not performed a laryngectomy within at least three of the five years preceding Callaway's surgery. Thus, O'Connell concludes Dr. Hood is precluded from testifying about either the standard of care related to the performance of the procedure or any issues otherwise related to the procedure such as informed consent.

O'Connell reads Georgia's expert witness statute too narrowly. First, Callaway has conceded that Dr. Hood will not testify on O'Connell's surgical performance. Rather, Dr. Hood asserts he will limit his testimony to the issues of O'Connell's evaluation of Callaway, O'Connell's consultation with Callaway regarding treatment options, and how the surgical technique affected Callaway's postoperative care.

Second, the statute does not require an expert witness testifying against a surgeon to have performed the precise surgery at issue to offer an opinion on any matter related to the medical care provided by the defendant surgeon. *See Nathans*, 282 Ga. at 807, 654 S.E.2d at 124 (evaluating whether the expert otolaryngologist had

"performed surgeries *like* the one in question or obtained informed consents for *similar* surgeries" and whether any surgeries performed by the expert "involved risks that are *similar* to the risks involved with the surgery" performed by the defendant (emphasis added)).  Citing *Akers v. Elsey*, 294 Ga. App. 359, 670 S.E.2d 142 (2008) and *Long v. Natarajan*, 291 Ga. App. 814, 662 S.E.2d 876 (2008), O'Connell contends these cases hold, respectively, that a surgeon is not competent to testify as an expert unless he has "performed the specific surgery at issue within the requisite time period" and that "non-surgeons may not provide standard of care criticisms against surgeons in such matters." (Doc. 31 at 6).  Neither case stands for the proposition for which O'Connell cites it.  In *Akers*, the court held that neither proffered expert was competent to testify *regarding the performance of the procedure* because neither expert had practiced or performed the procedure within the requisite time period.  294 Ga. App. at 362, 670 S.E.2d at 144.  Again, Callaway concedes Dr. Hood cannot criticize O'Connell's performance of the procedure.  In *Long*, the court held that the plaintiff's family practitioner could not testify as an expert against the defendant surgeon because the family practitioner's affidavit did not provide sufficient information for the court to determine whether the testimony was the product of reliable principles and methods or whether the witness applied the principles and methods reliably to the facts pursuant to O.C.G.A. § 24-7-702(b).  291 Ga. App. at 817-18, 662 S.E.2d at 879.  The claim at issue was for battery rather than medical malpractice, and the court did not evaluate the proffered expert's competency pursuant to O.C.G.A. § 24-7-702(c).  Moreover, the court never made the broad holding that O'Connell claims, i.e., non-surgeons cannot provide standard of care criticisms against surgeons on issues other than the performance of the procedure.

Instead, the appropriate inquiry is whether the expert has professional knowledge and experience regarding the specific issues on which the expert intends to testify. *Compare Cartledge v. Montano*, 325 Ga. App. 322, 326-27, 750 S.E.2d 772, 776-77 (2013) (holding that an expert who was board certified in obstetrics and gynecology for over 30 years was not precluded from testifying against the defendant gynecologist regarding issues surrounding the performance of surgery even if the expert had not performed the same procedure at issue), *with Bonds v. Nesbitt*, 322 Ga. App. 852, 858, 747 S.E.2d 40, 46 (2013) (finding that an expert who specialized in pulmonary and critical care medicine who did not regularly practice in the emergency room could not testify regarding an ER physician's standard of care), *and Hope v. Kranc*, 304 Ga. App. 367, 369-70, 696 S.E.2d 128, 130-31 (2010) (holding that a veteran general practitioner was precluded from evaluating the performance of a specialist, regardless of whether the issues involved procedures or referrals).

Here, O'Connell and Dr. Hood are both community-based otolaryngologists who treat patients with laryngeal cancer.  Although Dr. Hood no longer performs laryngectomies,[4] he provides the same preoperative and postoperative care as O'Connell.  Dr. Hood intends to testify on the issues of informed consent and causation.  O'Connell does not challenge Dr. Hood's qualifications to testify on these issues except by arguing all material issues in this case "relate directly to and/or flow from the performance of surgery." (Doc. 31 at 5).  Clearly, the issue of obtaining informed consent for a surgical procedure is distinct from the performance of the surgery itself.

---

[4] Dr. Hood testified that he previously performed laryngectomies, including on a patient with Stage 4 laryngeal cancer. (Doc. 17-4 at 8:19 – 9:4).  He further testified that he no longer does laryngectomies because he did not perform them regularly, and he believes patients could be better served by having surgery at an academic center. (Doc. 17-4 at 9:5-11).

Further, the requirements of O.C.G.A. § 24-7-702(c) do not apply to causation testimony.  *See Bonds*, 322 Ga. App. at 858-59, 747 S.E.2d at 46-47 (finding that a medical expert had the qualifications to testify regarding causation although the expert was not qualified to give his opinion on the applicable standard of care).  O'Connell does not contend that Dr. Hood's testimony is otherwise inadmissible pursuant to Rule 702.  Accordingly, O'Connell's motion in limine to exclude the testimony of Dr. Hood is **DENIED**.  Of course, the scope of Dr. Hood's testimony will be limited to the issues remaining after the Court's ruling on O'Connell's motion for summary judgment.

## C.  Dr. Matthew E. Spector

O'Connell's initial argument that Dr. Spector is incompetent to testify as an expert rests on Dr. Spector's status as a resident during the requisite time period provided by the qualifications statute.  Dr. Spector's medical license precluded him from performing any non-emergency surgery, including a laryngectomy, without the supervision of an attending physician during his residency.  Thus, O'Connell contends Dr. Spector is precluded from testifying about the standard of care.  O'Connell further argues Dr. Spector is incompetent to testify because he could not have made the decision regarding what treatment options to present to a cancer patient without supervision.

This argument is wholly without merit.  Georgia law does not preclude a medical professional from testifying as an expert merely because he was a resident during the five years preceding the alleged negligence.  In *Emory-Adventist, Inc. v. Hunter*, 301 Ga. App. 215, 687 S.E.2d 267 (2009), the court found a resident who "had engaged in actual clinical patient care in the proffered area for the requisite time period" was competent to testify as an expert regarding the applicable standard of care.  *Id.* at 218-

19, 687 S.E.2d at 270-71.  The fact that the expert was required to perform certain acts under the supervision of practicing physicians during his residency had no bearing on his competency to testify.  *See id.* at 219, 687 S.E.2d at 270-71.  Further, the court noted that the license requirement in the qualifications statute only requires the expert to be licensed at the time of the alleged malpractice.  *Id.* at 217, 687 S.E.2d at 269 ("Had the General Assembly intended to impose a license requirement during three of the last five years, it could have plainly done so by including the words 'active practice of a licensed physician' in the statute and/or defining such term.").

Belatedly acknowledging the holding in *Emory-Adventist* in his reply brief, O'Connell now argues that Callaway must show specific evidence of Dr. Spector's regular and repeated performance of the acts alleged in this case during his residency. *See Aguilar v. Children's Healthcare of Atlanta, Inc.*, 320 Ga. App. 663, 665, 739 S.E.2d 392, 395 (2013) (distinguishing the expert's lack of qualifications from those of the expert in *Emory-Adventist* because, although both were residents during the requisite time period, the expert in *Emory-Adventist* "had regularly engaged in the repeated performance of acts relevant to the acts or omissions alleged to constitute malpractice").

O'Connell contends Dr. Spector's deposition testimony provides insufficient evidence of the number of and degree of participation in total laryngectomies prior to April 2011.  This argument is also without merit.  Dr. Spector testified that he had actively participated in "around ten" total laryngectomies by performing the surgery with a faculty member or fellow.  (Doc. 17-5 at 8:4-16).  There is no requirement that Dr. Spector specify the degree to which he physically performed each surgery, and as

noted above, those surgeries are not disqualified from the Court's evaluation of Dr. Spector's competency merely because they were supervised.

Dr. Spector's other qualifications show he has sufficient professional knowledge and experience acquired through the active practice of the specialized field of medicine at issue.  At the time of Callaway's surgery, Dr. Spector was in the fourth year of a five-year program to become a head and neck cancer surgeon.  As the chief resident, Dr. Spector ran the tumor board[5] and was actively involved in counseling patients about their treatment options.  Dr. Spector also obtained informed consent from cancer patients for total laryngectomies during the requisite time period.  Thus, Dr. Spector is clearly competent to testify regarding the applicable standard of care.  O'Connell does not contend that Dr. Spector's testimony is otherwise inadmissible pursuant to Rule 702. Accordingly, O'Connell's motion in limine to exclude the testimony of Dr. Spector is **DENIED**.

### D.  Dr. Trad Wadsworth

Callaway challenges Dr. Wadsworth's competency to testify regarding the standard of care under both O.C.G.A. § 24-7-702(c) and Rules 702 and 703.  Callaway contends that Dr. Wadsworth's testimony fails under Georgia's qualifications statute and the federal rules because he is unable to articulate the appropriate standard of care. Specifically, Callaway argues Dr. Wadsworth testified that the standard of care applicable to O'Connell is that of a similarly-trained doctor or a localized standard based on practices in Upson County, which is inconsistent with Georgia case law stating the standard of care is that which is employed by the profession generally.  Callaway

---

[5] A tumor board is a meeting of a multidisciplinary panel of physicians, including surgeons, medical oncologists, pathologists, and radiologists, who review and discuss the medical condition and treatment options for cancer patients.

argues that Dr. Wadsworth's methodology is further flawed because he measures

O'Connell's compliance with the standard of care by evaluating whether O'Connell

acted reasonably and prudently and by the results of Callaway's surgery.

In Georgia, the legal duty owed by a medical professional is "a reasonable

degree of care and skill."  O.C.G.A. § 51-1-27.  "[T]he reasonable degree of care and

skill required of physicians is that 'which is ordinarily employed by the profession

generally and not such as is ordinarily employed by the profession in the locality or

community.'"  *West v. Breast Care Specialists, LLC*, 290 Ga. App. 521, 523, 659 S.E.2d

895, 897 (2008) (citations omitted).  This legal duty, however, does take into

consideration "similar conditions and like circumstances."  *Smith v. Finch*, 285 Ga. 709,

711, 681 S.E.2d 147, 149 (2009) (citations omitted).  Expert testimony is required to

establish the required level of skill and care, i.e., the standard of care, in a particular

case.  *Kapsch v. Stowers*, 209 Ga. App. 767, 767, 434 S.E.2d 539, 540 (1993) (citations

omitted).  In considering whether a physician has complied with the standard of care,

"the jury may consider *all* the attendant facts and circumstances which may throw light

on the ultimate question."  *Critser v. McFadden*, 277 Ga. 653, 644, 593 S.E.2d 330, 332

(2004) (quoting *Word v. Henderson*, 220 Ga. 846, 849, 142 S.E.2d 244, 247 (1965)).

While Callaway contends Dr. Wadsworth posits a standard of care based on

O'Connell's locality, Dr. Wadsworth's testimony read in the context of his entire

deposition shows that he was merely taking into account similar conditions and like

circumstances as part of the applicable standard of care.  Dr. Wadsworth defined the

standard of care generally: "It is a concept, what is reasonable and prudent, what would

other people do in the same situation given the same variables.  That's the standard of

care." (Doc. 35 at 62:25 – 63:3).  Dr. Wadsworth also discussed the standard of care

applicable to this case when he opined on the best practices for a patient like Callaway:

> The best practices … would be to secure the airway, to get a biopsy, and work up the patient for local, regional, and distant disease with the imaging that we discussed and then once that workup is complete, have a conversation with the patient about treatment options.  If a multidisciplinary tumor board is available, like it is at major academic centers, that would be the next step following the staging workup.  If that's not available, then the primary treating physician needs to make those decisions.  Ideally it's available, but quite frankly it's not, unfortunately, able to be everywhere.

(Doc. 35 at 12:13-25).  Dr. Wadsworth went on to testify why he believed O'Connell

complied with the standard of care:

> We have a patient who has a T4 N0 M0 squamous cell carcinoma of the larynx with a nonfunctional organ, cartilage transgression on CT scan suspected.  The treatment within the standards of care that I believe is accurate is for surgery with a laryngectomy, with or without neck dissection, with planned adjuvant radiation therapy, with or without chemotherapy, depending on what the pathology shows, with a good oncologic outcome meaning the cancer is gone.  We have that in this patient.  He's two years out.  There is no sign of cancer.  So oncologically that is within the standard of care.  The patient had postoperative complications also, well-described in the literature, so commonly a fistula is that most people expect it, although I have issue with that, but the literature supports that.  Complications occur with that within the standard of care.  So in this specific case, using that metric, right decisions for the right treatment, right oncologic outcome, complications that are within expected standards of care, that global picture to me clearly shows that that is within the standard of care.

(Doc. 35 at 79:7 – 80:5).  Thus, Dr. Wadsworth did not determine O'Connell's conduct

fell within the standard of care solely because Callaway is now cancer free.  Rather, Dr.

Wadsworth testified that O'Connell achieved the desired outcome, which is a factor in

determining compliance with the standard of care.

Thus, Callaway's contention that Dr. Wadsworth is unable to articulate the applicable standard of care is without merit.  Accordingly, Callaway's motion in limine to exclude the testimony of Dr. Wadsworth is **DENIED**.

### III. MOTION FOR SUMMARY JUDGMENT

#### A.  Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  The burden rests with the moving party to prove that no genuine issue of material fact exists.  *Info. Sys. & Networks Corp.*, 281 F.3d at 1224.  The party may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The non-moving party does not satisfy his burden "if the rebuttal evidence is 'merely colorable, or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 249-50 (1986)).  However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … .  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255 (citation omitted).

### B.  Informed Consent Claim

In his complaint, Callaway alleges that O'Connell failed to obtain informed consent because he did not properly advise Callaway regarding: (1) his treatment options; (2) the substantially similar survival rates for those choosing non-surgical treatment compared to those who have total laryngectomies; and (3) the advantages of choosing chemoradiation over surgery, such as preserving the voice box and the ability to eat and drink without compromise.  In his response brief, Callaway suggests his informed consent claim is also based on O'Connell's failure to advise him of the material risks of a laryngectomy, such as the possibility of fistula development and disability as a result of a fistula.  However, neither Callaway's complaint nor his Rule 26 expert disclosures identify this as a basis for his informed consent claim.  O'Connell primarily argues that he complied with the requirements of Georgia's informed consent statute, which forecloses Callaway's informed consent claim.

Georgia's informed consent statute provides: "any person who undergoes any surgical procedure under general anesthesia, spinal anesthesia, or major regional anesthesia … must consent to such procedure and shall be informed in general terms of the following:

> (1) A diagnosis of the patient's condition requiring such proposed surgical or diagnostic procedure;

(2) The nature and purpose of such proposed surgical or diagnostic procedure;

(3) The material risks generally recognized and accepted by reasonably prudent physicians of infection, allergic reaction, severe loss of blood, loss or loss of function of any limb or organ, paralysis or partial paralysis, paraplegia or quadriplegia, disfiguring scar, brain damage, cardiac arrest, or death involved in such proposed surgical or diagnostic procedure which, if disclosed to a reasonably prudent person in the patient's position, could reasonably be expected to cause such prudent person to decline such proposed surgical or diagnostic procedure on the basis of the material risk of injury that could result from such proposed surgical or diagnostic procedure;

(4) The likelihood of success of such proposed surgical or diagnostic procedure;

(5) The practical alternatives to such proposed surgical or diagnostic procedure which are generally recognized and accepted by reasonably prudent physicians; and

(6) The prognosis of the patient's condition if such proposed surgical or diagnostic procedure is rejected.

O.C.G.A. § 31-9-6.1(a).  "The Georgia informed consent statute does not impose a general requirement of disclosure upon physicians; rather, it requires physicians to disclose only those factors listed [above]."  *Blotner v. Doreika*, 285 Ga. 481, 482, 678 S.E.2d 80, 81 (2009) (citation omitted).  There is no "common law duty to inform patients of the material risks of a proposed treatment or procedure" apart from what is required under the statute.  *Id.* at 481, 678 S.E.2d at 80.  Further, the informed consent statute "must be strictly construed and cannot be extended beyond its plain and explicit terms," meaning there can be no "impermissibly expanded[,] … judicially-created[] duty of disclosure."  *Id.* at 482-83, 678 S.E.2d at 81.

The informed consent statute also defines the elements of a medical malpractice claim based on a breach of the statute.  The plaintiff must make a showing:

(1) That [he] suffered an injury which was proximately caused by the surgical or diagnostic procedure;

(2) That information concerning the injury suffered was not disclosed as required by this Code section; and

(3) That a reasonably prudent patient would have refused the surgical or diagnostic procedure or would have chosen a practical alternative to such proposed surgical or diagnostic procedure if such information had been disclosed;[6]

provided, however, that, as to an allegation of negligence for failure to comply with the requirements of this Code section, the expert's affidavit required by Code Section 9-11-9.1 shall set forth that the patient suffered an injury which was proximately caused by the surgical or diagnostic procedure and that such injury was a material risk required to be disclosed under this Code section.

O.C.G.A. § 31-9-6.1(d).

Strictly construing section (d) of Georgia's informed consent statute, the statute

contemplates a cause of action based on an injury resulting from an undisclosed

material risk of the procedure.  This is apparent from reading subsection (d)(2),

requiring an injury resulting from information that was not disclosed, with the

---

[6] This portion of the statute presents an interesting question for an informed consent claim brought in federal court pursuant to diversity jurisdiction.  Under Georgia law, this element of an informed consent claim uses a lay standard which is "measured by the patient's need for information rather than by the standards of the medical profession." *Ketchup v. Howard*, 247 Ga. App. 54, 62, 543 S.E.2d 371, 378 (2000), *overruled on other grounds by Blotner*, 285 Ga. At 483, 678 S.E.2d at 81.  Thus, "expert testimony would not be required to establish that the patient's decision to either have or reject the proposed treatment because of the risk would have been affected." *Id.* at 63, 543 S.E.2d at 378.  Rather, the jury would "determine whether an ordinary, reasonable, and prudent person in the patient's position would have rejected the proposed treatment or procedure using lay standards." *Id.* at 63, 543 S.E.2d at 378-79.  To establish this, a plaintiff presumably would opine that, assuming the doctor had given him the required information, he would have followed a different course.  In effect, he would answer a hypothetical question.  In federal court, however, only experts can testify based on hypotheticals. *See United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005) (citations omitted) ("[T]he ability to answer hypothetical questions is '[t]he essential difference' between expert and lay witnesses.").

-17-

requirement that an expert testify that such injury was caused by a material risk required to be disclosed pursuant to subsection (a)(3). [7]

Essentially, Callaway's complaint and his experts allege that O'Connell breached his duty to obtain informed consent because he did not advise him of practical alternatives as required by O.C.G.A. § 31-9-6.1(a)(5). [8]   Indeed, there is substantial evidence that O'Connell dissuaded Callaway from pursuing alternatives to surgery.  But Callaway has not cited, nor has the Court found, any authority supporting the existence of an informed consent claim based solely on the failure to disclose practical alternatives.  Thus, Callaway does not have a viable informed consent claim.

Even if Callaway had premised his informed consent claim on the failure to disclose the risk of developing a fistula or the disability resulting from a fistula, his claim would still fail.  The statute enumerates the material risks which must be disclosed.  The only conceivable category of risks a fistula could fall under is "loss or loss of function of any limb or organ."  O.C.G.A. § 31-9-6.1(a)(3).  Assuming a fistula falls into this category, O'Connell disclosed this risk on the consent form.  (Doc. 17-6 at 14).  If a fistula does not fall within this category, however, then failure to disclose that risk cannot be the basis of an informed consent claim because it is not one of the enumerated risks

---

[7] The Court recognizes the requirement that a plaintiff attach an expert affidavit to his complaint in a professional malpractice action pursuant to O.C.G.A. § 9-11-9.1 does not apply in federal court.  *See Brown v. Nichols*, 8 F.3d 770, 773 (11th Cir. 1993) (citations omitted) (declining to reach the issue of whether Georgia's expert affidavit requirement applied in federal court but noting that federal law governs pleading requirements in a diversity action); *Robinson v. Corr. Med. Assocs., Inc.*, 2010 WL 2499994, at *4 (N.D. Ga.) (holding that O.C.G.A. § 9-11-9.1 does not apply in federal court because it is a heightened pleading requirement that conflicts with Fed. R. Civ. P. 8(a)).  Nevertheless, the Court finds this language persuasive in interpreting the General Assembly's intent when it created this cause of action.

[8] Callaway also argues in his brief that the informed consent statute bars neither a malpractice claim for O'Connell's failures to consider other treatment options and use the multidisciplinary approach as part of his diagnosis nor a claim based on O'Connell's failure to perform the surgery to which Callaway consented.  However, Callaway has not asserted a negligent diagnosis or battery claim in his complaint. Rather, he is attempting, in effect, to assert a common law informed consent claim, just as his lawyer attempted to do in *Blotner*.

in the statute.  Accordingly, O'Connell is entitled to summary judgment on Callaway's informed consent claim.

### C. Negligent Performance of Surgery Claim

Callaway has also asserted a claim for the negligent performance of his total laryngectomy.  Callaway alleges that O'Connell performed a partial laryngectomy at best and failed to remove any lymph nodes.  O'Connell did not move for summary judgment on this claim but rather argues for the first time in his reply brief that the only qualified expert, Dr. Wadsworth, testified that O'Connell's surgical performance complied with the standard of care.  As discussed above, Dr. Spector is competent to testify that O'Connell breached the standard of care.  Thus, even if O'Connell had appropriately moved for summary judgment on Callaway's negligent performance claim, this argument would fail.  Accordingly, summary judgment is not appropriate on this claim.

### IV.    CONCLUSION

For the foregoing reasons, O'Connell's motions in limine are **DENIED**, O'Connell's motion for summary judgment is **GRANTED in part and DENIED in part**, and Callaway's motion in limine is **DENIED**.

**SO ORDERED**, this the 29th day of August, 2014.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT